**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
PATRICIA ZAPPONE,            :
                             :
     Plaintiff,              :
                             :
v.                           :    Civil No. 3:99CV00944 (AWT)
                             :
TOWN OF WATERTOWN, et al.,   :
                             :
     Defendants.             :
                             :
-----------------------------x
```

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Patricia Zappone brings this action against the Town of Watertown (the "Town") and the following members of the Watertown Police Department (the "Police Department"): Chief of Police John F. Carroll, Deputy Police Chief John C. Gavellas, Sergeant Robert Scannell, Sergeant Robert Desena, Sergeant George Romano, Thomas O'Neil, David Marinaro, Brian O'Neill, George Zappone, Jr., Officers John Doe #1-12, Michael Markiewicz, Patrick Girouard, Jason Demarest, and David Bromley. The court has previously granted in part and denied in part a motion for summary judgment filed by defendant George Zappone, Jr. The remaining defendants (except the John Does) have moved for summary judgment as to all the claims against them. For the reasons set forth below, their motion is being granted, and the case is being dismissed as to the John Does.

I.   **FACTUAL BACKGROUND**

The plaintiff, Patricia L. Zappone, was married to George
Zappone, Jr., one of the defendants in this action, at all times
relevant to the complaint.  During the course of their marriage,
Patricia Zappone and George Zappone, Jr. resided at 155 Chimney
Road (the "Marital Residence") in Watertown, Connecticut, which
was adjacent to the residence of George Zappone, Jr.'s parents,
George Zappone, Sr. and Irene Zappone (the "In-Law Residence").
George Zappone, Jr. was at all relevant times an officer with
the Police Department.  Patricia Zappone ran "All About Kids," a
nursery school and daycare center.

In 1996, Patricia Zappone and George Zappone, Jr. were
experiencing marital difficulties.  In March 1996, George
Zappone, Jr. commenced divorce proceedings.  Between March 16,
1996 and May 2, 1996, Town police officers were called to the
Marital Residence and to the daycare center on several occasions
as the result of disputes over marital property, child custody
issues and vandalism.  The only person arrested as a result of
any of these incidents was Linda Cahill, George Zappone, Jr.'s
sister; she was arrested on a criminal charge related to
harassing telephone calls.  The Zappones reconciled temporarily
in May 1996, and the divorce proceedings were halted.

In April 1997, Patricia Zappone filed for divorce.  On
April 26, 1997, the Police Department received a call from

Patricia Zappone complaining of a domestic problem at the Marital Residence.  By the time police officers arrived, both Patricia Zappone and George Zappone, Jr. had left the premises. Patricia Zappone had gone to the Police Department, where she met with defendant Sergeant Scannell.  In a written statement the plaintiff gave to Sergeant Scannell, she stated that George Zappone, Jr. had punched her in the left cheekbone.  During the interview, Sergeant Scannell noticed some reddening on the plaintiff's face where she alleged George Zappone, Jr. had hit her.  This reddening dissipated during the course of the interview.  Sergeant Scannell did not see any other signs of physical injury.

The plaintiff reported that, when she arrived at the Marital Residence at approximately 7:15 p.m., she discovered that for the second time in as many days her husband had shut the telephone off.  The plaintiff decided to pack some clothes for herself and their daughter, Brittany.  The plaintiff contends that George Zappone, Jr. grabbed Brittany and forced her outside to his car as the plaintiff followed him.  The plaintiff also contends that as she grabbed onto Brittany to pull her away from him, George Zappone, Jr. pushed the plaintiff away with his elbow, and that then, after the plaintiff backed away and again tried to grab Brittany, George Zappone, Jr. punched the plaintiff in her left cheekbone with a closed fist.

3

The plaintiff stated that George Zappone, Jr. then drove away with their daughter and the plaintiff went inside to call the Police Department.  Before the police arrived, however, the plaintiff decided to drive directly to the Police Department.

On April 28, 1997, Sergeant Scannell interviewed George Zappone, Jr. at the Police Department concerning the April 26, 1997 incident.  During the interview, George Zappone, Jr. claimed that Patricia Zappone had grabbed and clawed at his neck and shoulder during a struggle over their daughter.  While the statement Sergeant Scannell obtained from the plaintiff had been handwritten by her, the statement he obtained from George Zappone, Jr. was typed.  The plaintiff contends it was not written by George Zappone, Jr. but, rather, was typed by the Police Department.  Patricia Zappone has no reason to doubt that George Zappone, Jr. told Sergeant Scannell that he had been assaulted by her.  She does not deny that there was physical contact between her and George Zappone, Jr. as they struggled over their daughter but insists that, if she touched him, it was unintentional.

On April 28, 1997, Sergeant Scannell applied for and obtained arrest warrants for both George Zappone, Jr. and Patricia Zappone on the charge of disorderly conduct.  In the application for the arrest warrant for Patricia Zappone, Sergeant Scannell included the plaintiff's version of events,

4

including her allegation that she had been struck by George Zappone, Jr.

On April 30, 1997, George Zappone, Jr. was arrested pursuant to a warrant.  On the advice of her attorney, Patricia Zappone voluntary surrendered at the police headquarters on May 1, 1997.  All of the criminal charges arising from the April 26, 1997 incident were eventually nolled by the Connecticut Superior Court.  There are no other claims that George Zappone, Jr. physically assaulted Patricia Zappone.

On April 30, 1997 around 11:30 am., the Police Department received a call from Patricia Zappone.  According to the police incident report prepared by defendant Sergeant George Romano, Patricia Zappone claimed that George Zappone, Jr. had taken some jewelry belonging to her from the Marital Residence.  She reported that he had also come to the Marital Residence in the company of defendants Brian O'Neill and David Bromley and, in their presence, taken an air compressor.  Additionally, George Zappone, Jr. had gone to "All About Kids" that day and fired Mary Ann Kellis, the assistant manager, over Patricia Zappone's objection.  Patricia Zappone also claimed that she was being stalked by George Zappone, Jr. and his family because they were watching her from the In-Law Residence.  Sergeant Romano attempted to explain the stalking statute to Patricia Zappone

and told her that he would submit a full report indicating her wishes and also indicating her complaints.

Around 11:50 a.m., Sergeant Romano, Sergeant James Sheehan, and Officer Brian O'Neill were dispatched to the Marital Residence in response to a complaint of an unwanted party.  The unwanted party was George Zappone, Jr.  Sergeant Romano spoke with Patricia Zappone's attorney, who was at the scene, and told her that a report would be put on file concerning Patricia Zappone's complaint.  The officers interviewed both Patricia Zappone and George Zappone, Jr.  Sergeant Romano informed Patricia Zappone that the dispute over the items taken from the Marital Residence and the firing of Mary Ann Kellis were civil in nature and that she should discuss them with her attorney. Sergeant Sheehan interviewed George Zappone, Jr., who said that he was at the Marital Residence working on his motorcycle so he could remove it and other belongings from the garage.  George Zappone, Jr. said there was no restraining order against him. Patricia Zappone showed Sergeant Sheehan her copy of a restraining order dated April 28, 1997.  The restraining order prohibited George Zappone, Jr. from imposing any restraints on Patricia Zappone's liberty and from threatening, harassing, assaulting, molesting, sexually assaulting, or attacking her. The restraining order did not prohibit George Zappone, Jr. from entering the Marital Residence; a hearing on the restraining

6

order had been scheduled for May 7, 1997 in Waterbury Superior
Court.

Sergeant Sheehan told the plaintiff that he could not order
George Zappone, Jr. to leave because the restraining order did
not prohibit him from entering the Marital Residence.  The
plaintiff told the officer that she understood that but felt
threatened by his presence.  The plaintiff stated that George
Zappone, Jr. was harassing her by being there and that she felt
she would be in danger once the officers left.  The officers
remained at the Marital Residence until George Zappone, Jr. left
to go to the In-Law Residence.

At approximately 5:21 p.m. on April 30, 1997, defendant
Sergeant Desena received a call at the Police Department from
George Zappone, Jr. during which Zappone stated that he intended
to go to the Marital Residence to retrieve a motorcycle from the
garage.  George Zappone, Jr. requested that Sergeant Desena
accompany him to ensure there were no violations of the
April 28, 1997 restraining order.  Sergeant Desena told George
Zappone, Jr. not to go to the Marital Residence until Desena
arrived.  Desena then asked defendant Officer Thomas O'Neil to
meet him at the Marital Residence.  Upon his arrival at the
Marital Residence, Sergeant Desena found a vehicle operated by
George Zappone, Sr. blocking the driveway.  Sergeant Desena also
found that Betty E. Dest, Patricia Zappone's mother, was in a

pickup truck in the driveway, and was being blocked in by George Zappone, Sr.'s vehicle.  Betty Dest explained that she was waiting to take her granddaughter, Brittany, to an appointment. George Zappone, Sr. went to the Marital Residence and became verbally abusive towards Sergeant Desena; the officers told him to leave the area.

Around this time, in Officer Thomas O'Neil's presence, George Zappone, Sr. made a reference to having guns and stated that he would "blow the head off" his daughter-in-law.  Patricia Zappone was not present when this threat was made.  However, Officer O'Neil immediately arrested George Zappone, Sr. and placed him in his patrol car.  George Zappone, Sr. was issued a misdemeanor summons and charged with breach of peace.  George Zappone, Sr. was then released on a promise to appear.

Around the same time, Sergeant Desena observed George Zappone, Jr. drive his private vehicle onto the front lawn of the Marital Residence at an excessive rate of speed and stop abruptly twenty-five feet from Sergeant Desena and Patricia Zappone.  Sergeant Desena issued a summons to George Zappone, Jr. for disorderly conduct.  At some point during these incidents, defendant Deputy Chief John Gavallas arrived at the scene.

On May 2, 1997, George Zappone, Jr. called the Police Department to report that the Waterbury Superior Court had

issued a protective order and all firearms were to be removed from the Marital Residence.  Four firearms were located and retrieved from the Marital Residence and placed in an evidence locker at the Police Department.

On May 17, 1997, George Zappone, Jr. contacted the Police Department and spoke with defendant Officer Michael Markiewicz. George Zappone, Jr. complained that he believed Patricia Zappone may have thrown away certain of his personal property, which had been located in their garage.  George Zappone, Jr. asked Officer Markiewicz to contact Patricia Zappone to determine if any parts belonging to his Corvette had been thrown away.  Patricia Zappone informed Officer Markiewicz that if George Zappone, Jr. wanted information about his motorcycle parts, motor vehicle parts or anything of that nature, he should contact her through his attorney.  She indicated that the Police Department should not contact her regarding these matters because they were civil matters, and that she saw no need for the police.  She also stated that she felt George Zappone, Jr. was using the Police Department to harass her.

On May 19, 1997, at approximately 6:09 p.m., Patricia Zappone contacted the Police Department and spoke with Sergeant Desena.  She complained that George Zappone, Jr. had refused to turn over custody of their daughter to Betty Dest.  Sergeant Desena and Sergeant Scannell investigated the plaintiff's

complaint.  They reviewed three protective orders and a restraining order on file at the Police Department.  They determined that there were no court orders regarding the transfer of the child.  Sergeant Desena and Sergeant Scannell then went to the Marital Residence to continue the investigation of the plaintiff's complaint and met with Betty Dest.

Sergeant Desena and Sergeant Scannell also went to the In-Law Residence to speak with George Zappone, Jr.  George Zappone, Jr. explained that he and his lawyer and Patricia Zappone and her lawyer had come to an agreement about the transfer of Brittany from the custody of one parent to the other.  According to George Zappone, Jr., he believed that when Patricia Zappone did not return home at 6:00 p.m., he was to keep Brittany until Patricia Zappone returned home.

On May 19, 1997 at approximately 10:10 p.m., Sergeant Desena received a call from George Zappone, Jr.  George Zappone, Jr. questioned the ownership and control of two vehicles used by him and Patricia Zappone.  Sergeant Desena told George Zappone, Jr. that this was a civil matter to be ultimately decided in connection with the divorce decree.

On May 20, 1997, Patricia Zappone went to the Police Department and delivered a stipulated agreement, signed by Patricia Zappone and George Zappone, Jr. on May 8, 1997 in the presence of their attorneys, concerning the transfer of their

10

daughter from the custody of one parent to the other.  Patricia Zappone asked to see Deputy Chief Gavallas, but he had left for the day, so Sergeant Desena spoke with her.  Patricia Zappone told him that if a problem occurred that evening in connection with the transfer of custody of their daughter, she would insist that members of the Police Department, including Sergeant Desena, arrest her husband for violating the stipulated agreement.  Sergeant Desena informed the plaintiff that the stipulated agreement was a civil court order and that a violation could result in the finding of contempt of court, but the Police Department could not arrest her husband for a violation.  He explained that the only order on file at the Police Department against her husband that could be the basis for criminal action was the restraining order.  The plaintiff told Sergeant Desena that if members of the Police Department did not arrest her husband, then if and when he violated the civil stipulated agreement, she would sue the Police Department and any members who fail to act on her request.

On May 27, 1997, Patricia Zappone contacted the Police Department and spoke with Sergeant Desena.  She complained that a bulldozer had been parked on her property earlier that morning and that when she returned home later that day, the bulldozer was no longer there.  Patricia Zappone believed that either her husband or his father, George Zappone, Sr., had moved the

bulldozer and consequently was in violation of a criminal protective order.  Sergeant Desena and Officer Thomas O'Neil checked the Police Department's records and found no criminal protective or restraining order in effect that would prohibit George Zappone, Jr. or George Zappone, Sr. from entering the property associated with the Marital Residence.

On June 4, 1997, Patricia Zappone's divorce attorney, Danielle Rado, contacted the Police Department and spoke with Sergeant Spencer Cerruto.  Attorney Rado stated that Patricia Zappone had reported to her a possible attempted entry into the garage at the Marital Residence.  Sergeant Cerruto and Officer McDonnell responded to the complaint by going to the Marital Residence.  They checked the garage and the perimeter of the property and found no one.

On June 9, 1997, Patricia Zappone contacted the Police Department and complained that she had heard a noise in front of her house and that after investigating, she found that the left front tire of her vehicle, which was parked in the driveway at the Marital Residence, was flat.  Sergeant Cerruto and Officer Thomas O'Neil investigated the complaint and found that the tire had been punctured.

On June 11, 1997, Sergeant Scannell, Sergeant Desena, and defendant Officer Patrick Girouard responded to the In-Law Residence in response to a complaint by Patricia Zappone that

George Zappone, Sr. was in the front yard of the Marital Residence. When the officers responded, George Zappone, Sr. stated that he had posted "no trespassing" signs around an exposed electrical cable on property, which he contended was owned by him and not associated with the Marital Residence, because he had been concerned that a boy who mowed Patricia Zappone's lawn might hit the exposed line.

Patricia Zappone gave an account of the incident to Sergeant Scannell and stated that she had a protective order against George Zappone, Sr. Sergeant Scannell located a copy of the protective order at the Police Department, and it specified no contact with the victim. Based on Patricia Zappone's statement about this incident, Sergeant Scannell applied for a warrant for the arrest of George Zappone, Sr. for criminal violation of a protective order. The arrest warrant application was rejected by an Assistant State's Attorney, who concluded that it appeared as if the victim had initiated the contact and that there was no evidence George Zappone, Sr. had been on the plaintiff's property as opposed to his own.

On June 30, 1997, Sergeant Desena and Officer David Bromley were dispatched to the In-Law Residence in response to a complaint by Irene Zappone that she witnessed her daughter-in-law, Patricia Zappone, removing surveyor stakes from the property associated with the In-Law Residence. A written

statement was obtained from Irene Zappone.  As a result of the
complaint, Patricia Zappone was issued a summons for illegal
removal of surveyor stakes.

On July 1, 1997, defendant Officer David Marinaro was
dispatched to the In-Law Residence in response to a complaint by
George Zappone, Sr. that Patricia Zappone was moving snowplows
that were on his property; the snowplows had been placed around
certain surveyor stakes.  The plaintiff's parents-in-law
informed Marinaro that they had hired Old Tyme Land Surveyors to
survey their property to determine the property line between the
Marital Residence and the In-Law Residence.  Marinaro was
informed that the metal stakes had been placed where the
surveyor had marked the property line.  The snowplows had been
placed around the metal stakes.  Marinaro also interviewed
Patricia Zappone.  During the interview, Patricia Zappone
requested that Officer Marinaro arrest George Zappone, Sr. for
violation of a restraining order.  Officer Marinaro asked
Patricia Zappone to come to the Police Department so that a
written statement could be drafted on a Police Department
computer.  Patricia Zappone refused and stated that she would
contact her attorney and explain that Officer Marinaro refused
to take her statement.  Officer Marinaro told Patricia Zappone
to have her attorney contact him to schedule a time to take her
statement.  On July 2, 1997, Officer Marinaro met with Robert

14

Sager, of Old Tyme Land Surveyors, and learned that the snowplows had been on property owned by George Zappone, Sr. at the time they were towed by Patricia Zappone.  On July 3, 1997, Sergeant Desena re-interviewed George Zappone, Sr. and Irene Zappone about the July 1, 1997 incident.  They stated that they wished to pursue the matter and have some form of action taken against Patricia Zappone.  On July 9, 1997, Attorney Rado presented Officer Marinaro with a written statement by the plaintiff concerning this incident; in this statement, the plaintiff admitted towing the snowplows with her vehicle.  On July 23, 1997, Officer Marinaro applied for a warrant for the arrest of Patricia Zappone for disorderly conduct in connection with the July 1, 1997 incident.  The application was approved by a prosecutor, and Patricia Zappone voluntarily surrendered on July 28, 1997 and was released on a promise to appear.

On July 3, 1997, George Zappone, Sr. contacted the Police Department and reported that a sign on his property has been vandalized.  Officer Todd Robinson prepared a report in connection with the complaint by George Zappone, Sr.  There was no further investigation of this complaint.

On July 7, 1997, Patricia Zappone contacted the Police Department.  Officer Marinaro was dispatched to the Marital Residence based on a complaint from Patricia Zappone that George Zappone, Sr. yelled and swore at her and Phillip Hardt while

15

they were in the front yard of the Marital Residence.  As a result of this incident, a summons was issued to George Zappone, Sr. for violation of a protective order.

On July 22, 1997, Irene Zappone contacted the Police Department and complained that Patricia Zappone had trespassed on her property.  A report was prepared by Officer Lisa Smith, and no further action was taken.

On August 2, 3, 4, 11, and 12, 1997, George Zappone, Jr. contacted the Police Department and complained that Patricia Zappone had denied him visitation with their daughter in violation of an agreement signed by George Zappone, Jr. and his attorney and Patricia Zappone and her attorney.  On each occasion, George Zappone, Jr. was advised that the complaint was a civil matter and that no action would be taken by the Police Department.

On August 25, 1997, Irene Zappone contacted the Police Department.  She complained that Patricia Zappone had left a message on her answering machine that upset her.  Officer Lisa Smith listened to the message and determined that there was no criminal conduct and that the incident related to a civil matter.

On August 26, 1997, both George Zappone, Jr. and Patricia Zappone contacted the Police Department.  George Zappone, Jr. complained that he had been denied visitation with their

16

daughter, while Patricia Zappone complained that George Zappone, Jr. had beeped his horn and looked at her house with binoculars when he attempted to pick up their daughter.  A report was prepared, and no further action was taken by the Police Department.

On September 7, 1997, Sergeant Scannell and Officer David Marinaro were dispatched to the Marital Residence in response to a complaint by Patricia Zappone.  The officers observed a vehicle belonging to George Zappone, Sr. blocking Patricia Zappone's driveway.  Patricia Zappone and John Borici were attempting to exit her driveway in a U-Haul truck with her personal belongings.  Attached to the truck was a trailer and boat, which were the joint property of Patricia Zappone and George Zappone, Jr.  While Sergeant Scannell and Officer Marinaro were speaking with Patricia Zappone, George Zappone, Jr. approached the boat and removed the license plate from the trailer.  At this point, Officer Marinaro restrained Patricia Zappone from confronting George Zappone, Jr.; Patricia Zappone contends that she suffered injuries to her knees from contact with Officer Marinaro.  Meanwhile, George Zappone, Jr. picked up a rock and smashed the taillight of the trailer and demanded that Patricia Zappone be arrested for operating a vehicle with a broken taillight.  The officers did not make any arrests or

issue any citations.  They allowed the plaintiff to proceed to her sister's home, where John Borici also resided.

On September 7, 2002 at approximately 6:00 p.m., Sergeant Scannell, defendant Officer Jason Demarest, Officer Sprano, and defendant Chief Carroll responded to the home of John Borici after Borici contacted the Police Department to complain that George Zappone, Jr. had appeared at his residence and was videotaping the boat and the trailer.  Also, George Zappone, Jr. confronted Patricia Zappone and called her derogatory names. George Zappone, Jr. stayed on the road and did not enter Borici's property, and he had departed before officers arrived at Borici's residence.  After the officers arrived, Patricia Zappone left the area in the U-Haul truck with the trailer and boat.  Chief Carroll escorted Patricia Zappone to the town line to ensure that there would be no further altercations with George Zappone, Jr. and that the plaintiff would not be stopped by any law enforcement officers because of the broken taillight and missing license plate.  During the course of this trip, the trailer came free from the U-Haul van because the boat trailer did not fit the trailer hitch.  Chief Carroll then assisted Patricia Zappone in reconnecting the trailer to the van.

On September 22, 1997, Patricia Zappone was the subject of a motor vehicle stop by Officer Jason DeMarest. Officer DeMarest did not know who the plaintiff was at the time he stopped her.

18

Patricia Zappone identified herself as a police officer's wife.
Officer DeMarest allowed her to leave without giving her a
ticket.

At all relevant times, the Police Department had adopted a
domestic abuse policy consistent with Conn. Gen. Stat. § 46b-
38b.  Most of the Town police officers' training is conducted at
the Municipal and State Police Training Academy in Meriden,
Connecticut.  However, Town police officers are re-certified
every three years concerning domestic abuse training by the
Police Department.

## II.  **STANDARD OF REVIEW**

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such
issue warrant judgment for the moving party as a matter of law.
Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S.
317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22
F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry
of summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will
bear the burden of proof at trial."  See Celotex Corp., 477 U.S.
at 322.

19

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. <u>See</u>, <u>e.g.</u>, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986); <u>Donahue v. Windsor Locks Bd. of Fire Comm'rs</u>, 834 F.2d 54, 58 (2d Cir. 1987); <u>Heyman v. Commerce & Indus. Ins. Co.</u>, 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." <u>Anderson</u>, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." <u>Gallo</u>, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is <u>both</u> genuine <u>and</u> related to a material fact. Therefore, the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the

governing law." Id. As the Court observed in Anderson: "[T]he
materiality determination rests on the substantive law, [and] it
is the substantive law's identification of which facts are
critical and which facts are irrelevant that governs." Id.
Thus, only those facts that must be decided in order to resolve
a claim or defense will prevent summary judgment from being
granted. When confronted with an asserted factual dispute, the
court must examine the elements of the claims and defenses at
issue on the motion to determine whether a resolution of that
dispute could affect the disposition of any of those claims or
defenses. Immaterial or minor facts will not prevent summary
judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d
Cir. 1990).

When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d
33, 41 (2d Cir. 2000) (quoting Del. & Hudson Ry. Co. v. Consol.
Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because
credibility is not an issue on summary judgment, the non-
movant's evidence must be accepted as true for purposes of the
motion. Nonetheless, the inferences drawn in favor of the non-
movant must be supported by the evidence. "[M]ere speculation
and conjecture" is insufficient to defeat a motion for summary

21

judgment.  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [non-movant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the non-movant.  Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the non-movant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial."  Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted).  Furthermore, "unsupported allegations do not create a material issue of fact."  Weinstock, 224 F.3d at 41.  If the non-movant fails to meet this burden, summary judgment should be granted.  The question then becomes:  is there sufficient evidence to

22

reasonably expect that a jury could return a verdict in favor of the nonmoving party.  See Anderson, 477 U.S. at 248, 251.

III. **DISCUSSION**

    A.   **False Arrest Claims**

    In the Third Count, the plaintiff claims that she was subjected to arrest without probable cause in violation of her rights guaranteed by the U.S. Constitution.  This same claim is repeated in the Fourth Count based on the Connecticut Constitution.  Specifically, the plaintiff claims that she was arrested without probable cause on May 1, 1997 in connection with the incident that occurred on April 26, 1997.  Because the plaintiff's arrest that resulted from the incident occurred on July 1, 1997, involving the moving of the snowplows, is not mentioned in either of the Third or Fourth Counts, it is unclear whether the plaintiff is relying on that arrest for purposes of those counts.  However, the defendants have addressed this second arrest in their papers, so the court proceeds as if the plaintiff had made allegations in the Third and Fourth Counts with respect to this second arrest.

    The plaintiff's contention is that, although she was arrested pursuant to a warrant on each occasion, the respective arrest warrant affidavits submitted by Sergeant Scannell dated April 28, 1997 and by Officer Marinaro dated July 23, 1997 intentionally excluded exculpatory information that would have

called into question whether there was probable cause to arrest
the plaintiff, and that if such information had been included,
the court issuing the warrant would not have found that probable
cause existed.

An individual has "the right to be free from an arrest
based on a warrant that would not have been issued if the
officer seeking the warrant had disclosed to the issuing
magistrate information within the officer's knowledge that
negated probable cause." <u>Smith v. Edwards</u>, 175 F.3d 99, 105 (2d
Cir. 1999)(<u>quoting</u> <u>Brown v. D'Amico</u>, 35 F.3d 97, 99 (2d Cir.
1994)). "A plaintiff can demonstrate that this right was
violated where the officer . . . knowingly and intentionally, or
with reckless disregard for the truth, made a false statement .
. . or omitted material information, and where such false or
omitted information was necessary to the finding of probable
cause." <u>Id.</u> (<u>quoting</u> <u>Soares v. Connecticut</u>, 8 F.3d 917, 920 (2d
Cir. 1993)(citations omitted); <u>see</u> <u>also</u> <u>Martinez v. City of</u>
<u>Schenectady</u>, 115 F.3d 111, 115 (2d Cir. 1997)(<u>quoting</u> <u>Soares</u>, 8
F.3d at 920)).

With respect to Sergeant Scannell's April 28, 1997 arrest
warrant affidavit, the plaintiff merely asserts in conclusory
fashion that Sergeant Scannell excluded exculpatory information.
However, the plaintiff fails to identify any such exculpatory
information and also fails to identify any statement in the

24

affidavit that is false.  In fact, the plaintiff admits to the truth of several of the statements in the affidavit and also admits that she has no knowledge as to the truthfulness of those portions of the affidavit concerning events which she did not personally witness.  In particular, the plaintiff has no personal knowledge of what George Zappone, Jr. said to the investigating officer during his interview concerning the events of April 26, 1997, and she testified that she has no reason to doubt that George Zappone Jr. alleged that he was assaulted by the plaintiff.  Moreover, a review of Sergeant Scannell's affidavit shows that he included a completely faithful report of Patricia Zappone's written statement giving her entire account of the April 26, 1997 incident.  (See Defendant's Loc. R. 56(a)(1) Statement, Ex. C and Ex. E.)  The affidavit also includes George Zappone, Jr.'s version of events, which was included in his written statement.

With respect to Officer Marinaro's July 23, 1997 arrest warrant affidavit, the plaintiff also fails to identify any statement in the affidavit that is false.  Moreover, in the written statement she provided to the investigating officer, the plaintiff admitted that she moved the snowplows.  (See Defendant's Loc. R. 56(a)(1) Statement, Ex. Z.)

Thus, the undisputed facts show that there was no material misrepresentation or omission in either of the arrest warrant

25

affidavits.  Because the plaintiff was arrested in each instance
pursuant to a valid arrest warrant, her false arrest claims
fail.  See Zak v. Robertson, 249 F. Supp. 2d 203, 206 (D. Conn.
2003) ("A plaintiff may only bring a claim of false arrest,
however, if he suffered a deprivation of liberty prior to the
issuance of legal process." (citing Singer v. Fulton County
Sheriff, 63 F.3d 110, 117 (2d Cir. 1995)).

Accordingly, because the foregoing analysis is equally
applicable to the plaintiff's federal and state law claims, the
defendants' motion for summary judgment is being granted with
respect to the false arrest claims in the Third and Fourth
Counts.

      **B.**    **Substantive Due Process**

In the First and Second Counts, the plaintiff claims that
her right to due process was violated because the defendants did
not immediately arrest George Zappone, Jr. in connection with
April 26, 1997 incident.  In the Third, Fourth and Seventh
Counts, she claims that her right to due process was violated by
various acts or failures to act of the defendants during the
period from April 30, 1997 through September 22, 1997.  The
plaintiff claims a violation of her rights under the U.S.
Constitution in the First, Third and Seventh Counts, and a

violation of her rights under the Connecticut Constitution in the Second and Fourth Counts.[1]

The plaintiff's substantive due process claims in the First and Second Counts are based on her contention that no action was taken against George Zappone, Jr. for several days after she complained that he had assaulted her on April 26, 1997.  She argues that her rights were violated because he was not arrested immediately.

For conduct to constitute a denial of substantive due process, it must be conduct which "can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience. . . . and is so brutal and offensive that it does not comport with traditional ideas of fair play and decency

---

[1] While the "[Connecticut] constitution <u>may</u>, in certain instances, afford greater substantive due process rights than the federal constitution," <u>Ramos v. Town of Vernon</u>, 254 Conn. 799, 836 (2000)(emphasis in original), generally "the due process provisions of both [the Connecticut and federal] constitutions have the same meaning and the same limitations." <u>Caldor's Inc. v. Bedding Barn, Inc.</u>, 177 Conn. 304, 314 (1979). In evaluating whether the Connecticut Constitution affords greater protection, Connecticut courts consider (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents; (5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies.  <u>See</u> <u>State v. Diaz</u>, 226 Conn. 514, 530-31 (1993).

. . . ."  <u>Smith v. Half Hollow Hills Cent. Sch. Dist.</u>, 298 F.3d 168, 173 (2d Cir. 2002)(internal citations and quotation marks omitted).  "Substantive due process is an outer limit on the legitimacy of governmental actions.  It does not forbid governmental actions that might fairly be deemed arbitrary or capricious. . . . Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."  <u>Natale v. Town of Ridgefield</u>, 170 F.3d 258, 263 (2d Cir. 1999).  "Only a substantial infringement of state law prompted by personal animus, or a deliberate flouting of the law that trammels significant personal or property rights, qualifies for relief under § 1983."  <u>Silverman v. Barry</u>, 845 F.2d 1027, 1080 (D.C. Cir. 1988).  Substantive due process does not afford a cause of action for police negligence.  <u>See</u> <u>Daniels v. Williams</u>, 474 U.S. 327, 328 (1986).

Here, the plaintiff argues that George Zappone, Jr. should have been arrested immediately, without a warrant, based on her statement that he struck her.  At the same time, the plaintiff claims that she should not have been arrested because the police should not have credited George Zappone, Jr.'s statement that the plaintiff had assaulted him.  There is no factual or legal support for the plaintiff's contention that she should have been believed while George Zappone Jr.'s complaint should have been

28

dismissed by the officers.  Sergeant Scannell investigated the
complaints of both parties, and on April 28, 1997, i.e., two
days after the incident, concluded that he "anticipate[d]
applying for arrest warrants" for both parties to the incident.
(Defendant's Loc. R. 56(a)(1) Statement, Ex. B.)

     The plaintiff's situation here falls far short of meeting
the standard of "shocking the conscience."  Compare County of
Sacramento v. Lewis, 523 U.S. 833, 1716-21 (1998)(rejecting
substantive due process claim where high-speed police chase with
no intent to harm suspect physically or to worsen legal plight
resulted in death), and DeLeon v. Little, 981 F. Supp. 728, 734-
36 (D. Conn. 1997)(rejecting substantive due process claim where
supervisor's cruel and abusive treatment of employee did not
"shock the conscience"), with Rochin v. California, 342 U.S.
165, 172-73 (1952)(finding substantive due process violation
where [an] officer, who had information that accused had been
selling narcotics, directed hospital staff to forcibly pump
victim's stomach, producing two capsules containing morphine for
prosecution purposes), and Johnson v. Newburgh Enlarged Sch.
Dist., 239 F.3d 246, 249, 252 (2d Cir. 2001)(finding gym
teacher's vicious physical attack upon a student who threw a
ball near him violated the student's substantive due process
right to be free of excessive force).

The plaintiff does not address in her opposition the remaining alleged bases for her substantive due process claims. However, the undisputed facts show that both the plaintiff and George Zappone, Jr. and the parents of George Zappone, Jr. constantly called the Police Department in connection with disputes revolving around child custody, personal property and the real property boundary line.  The Police Department responded and investigated each complaint that appeared as though it might involve criminal conduct.  In some instances an arrest was made, but in most instances no one was arrested.  In many instances, the complainant was informed that the dispute did not involve a criminal matter and no action would be taken. With respect to the numerous other interactions with members of the Police Department, which the plaintiff alleges in the Seventh Count, the defendants have presented evidence that the officer(s) involved acted appropriately in each instance, and the plaintiff has provided no evidence to the contrary, only mere speculation.

Accordingly, because the foregoing analysis is equally applicable to the plaintiff's federal and state law claims, the defendants' motion for summary judgment is being granted with respect to the substantive due process claims in the First, Second, Third, Fourth and Seventh Counts.

C.   **Equal Protection Claims**

In the First and Second Counts, the plaintiff claims that her right to equal protection was violated because the defendants did not immediately arrest George Zappone, Jr. in connection with the April 26, 1997 incident.  In the Third, Fourth and Seventh Counts, she claims that her right to equal protection was violated by various acts or failures to act of the defendants during the period from April 30, 1997 through September 22, 1997.  The plaintiff claims a violation of her rights under the U.S. Constitution in the First, Third and Seventh Counts and a violation of her rights under the Connecticut Constitution in the Second and Fourth Counts.[2]

To establish a claim for violation of the right to equal protection under the law, a plaintiff must demonstrate the following:

(1) he, compared with others similarly situated, was selectively treated; and (2) . . . such selective

_____

[2] While the Connecticut Supreme Court has previously "stated that the equal protection provision under [the] state constitution provides the same limitations as the federal equal protection provision, . . . this does not mean that the state equal protection provision can never have an independent meaning from the equal protection provision in the federal constitution." City Recycling, Inc. v. State, 257 Conn. 429, 444 (2001)(internal citations and quotations omitted).  In evaluating whether the Connecticut Constitution affords greater protection, Connecticut courts consider the factors set forth in State v. Diaz, 226 Conn. 514, 530-31 (1993). See footnote 1, supra, at 27.

> treatment was based on impermissible considerations
> such as race, religion, intent to inhibit or punish
> the exercise of constitutional rights, or malicious or
> bad faith intent to injure a person.

Silberberg v. Lynberg, 186 F. Supp. 2d 157, 169 (D. Conn. 2002).
The Supreme Court has recognized that there can be an equal
protection violation in a "class-of-one" case.  To establish a
class-of-one claim, the plaintiff must demonstrate that she has
been "intentionally treated differently from others similarly
situated and that there is no rational basis for the difference
in treatment."  Village of Willowbrook v. Olech, 528 U.S. 562,
564 (2000).

Here, the plaintiff brings her equal protection claims
under the "class-of-one" theory.  She argues that her complaints
about George Zappone, Jr. "were handled vastly different from
similarly situated complainants as well as her husband's alleged
complaints." (Plaintiff's Memorandum (Doc. No. 55), at 9.)
However, the plaintiff offers no evidence as to how any
complaints of similarly situated complainants were handled.  As
to the handling of complaints made by George Zappone, Jr., the
plaintiff argues that the Police Department's policy required
that statements from complainants be taken at the scene of the
incident and that George Zappone, Jr.'s statement with respect
to the April 26, 1997 incident not only was taken at police

32

headquarters but was typed up by an officer, while the plaintiff's statement was handwritten.  It should be noted, however, that neither party to the incident was at the Marital Residence when officers arrived on the scene, so no statement could have been taken from either party at the scene.  Also, establishing that George Zappone, Jr.'s statement with respect to the April 26, 1997 incident was typed by an officer, while the plaintiff's was not, would fall far short of demonstrating a constitutional violation.  The plaintiff does not even address in her opposition the other allegations in the complaint concerning her equal protection claims, and the evidence provided by the defendants supports the conclusion that there was a rational basis for any differences in how the plaintiff was treated compared to others and that there was no instance where a similarly situated person was intentionally treated differently.

Accordingly, because the foregoing analysis is equally applicable to the plaintiff's federal and state law claims, the defendant's motion for summary judgment is being granted with respect to the equal protection claims in the First, Second, Third, Fourth and Seventh Counts.

     D.   **Monell Claim; Negligence Claim**

In the Fifth Count, the plaintiff claims that the Town is liable to her.  It is well established that there is no

33

vicarious liability under 42 U.S.C. § 1983, and thus, the Town
may not be held liable under a theory of respondeat superior.
See Monell v. N.Y. City Dept. of Soc. Serv., 436 U.S. 658, 694
(1978).  Rather, the liability of the Town must be based on its
own acts or omissions.  "In order to establish the liability of
a municipality in an action under § 1983 for unconstitutional
acts by a municipal employee below the policymaking level, a
plaintiff must show that the violation of his constitutional
rights resulted from a municipal custom or policy." Gottleib v.
County of Orange, 84 F.3d 511, 518 (2d Cir. 1996).  "Instead, it
is when execution of a government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may
fairly be said to represent official policy, inflicts the injury
that the government as an entity is responsible." Monell, 436
U.S. at 694.

The plaintiff contends that defendant Carroll, who as chief
of the Police Department was a high-ranking policy maker, failed
to develop and implement operational guidelines as required by
Connecticut General Statutes § 46b-38b(e) and that violation of
the plaintiff's constitutional rights was the result of this
asserted failure on the part of defendant Carroll to implement
those operational guidelines.  The plaintiff also contends that
the Town condoned a pattern and practice of affording inadequate
protection, or no protection at all, to women who complained of

having been assaulted by husbands who are police officers.  In addition, the plaintiff contends that the Town had a duty to properly train and supervise its police officers in the performance of their duty to protect the plaintiff and others similarly situated and failed to do so.

The defendants have demonstrated that at all relevant times the Police Department had in effect a domestic abuse policy consistent with Connecticut General Statutes § 46b-38b and that there was no pattern or practice of affording inadequate protection to women who complained of having been assaulted by husbands who were police officers.  In addition, the defendants have demonstrated that, while the majority of the training of the Town's police officers is conducted at the state training academy, Town police officers are re-certified by the Police Department every three years concerning domestic abuse training.  The plaintiff has produced no evidence to the contrary.  Thus, the defendants' motion for summary judgment should be granted as to the plaintiff's Monell claim.

For the same reasons, the defendants' motion for summary judgment should be granted with respect to the negligence claim against defendant Carroll set forth in the Sixth Count, where the plaintiff alleges that she suffered "injuries and losses caused by the negligence of defendant Carroll in that he failed to comply with his ministerial duty to cause specific

35

operational guidelines for arrest policies as set forth aforesaid, to be implemented in violation of Connecticut General Statutes § 46b-36b." (Amended Complaint, ¶ 12.) See <u>Shore v. Town of Stonington</u>, 187 Conn. 147, 153 (1982) ("If by statute or other rule of law the officials' duty is clearly ministerial rather than discretionary, a cause of action lies for an individual injured from allegedly negligent performance.")

Accordingly, the defendants' motion for summary judgment is being granted with respect to the claims in the Fifth and Sixth Counts.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. No. 51) is hereby GRANTED. Judgment in favor of the Town of Watertown, John F. Carroll, John C. Gavallas, Robert Scannell, Robert Desena, George Romano, Thomas O'Neil, David Marinaro, Brian O'Neill, Michael Markiewicz, Patrick Girouard, Jason Demarest, and David Bromley shall enter with respect to the First, Second, Third, Fourth, Fifth, Sixth and Seventh Counts of the Amended Complaint. Also, this case is hereby DISMISSED as to Officers John Doe #1-12, who have never been identified or served.

The court has previously entered summary judgment in favor of defendant George Zappone, Jr. with respect to all claims against him except the state law claims set forth in the Eighth

and Ninth Counts.  Those claims are the sole remaining claims in the case and the only parties remaining are Patricia Zappone and George Zappone, Jr.

It is so ordered.

Date this 29th day of March 2006, at Hartford, Connecticut.


                                          /s/
                        _____
                                 Alvin W. Thompson
                           United States District Judge